JANETTE K. BRIMMER (WSB #41271)*
PAULO PALUGOD (WSB #55822)*
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA  98104-1711
(206) 343-7340 | Phone
jbrimmer@earthjustice.org
ppalugod@earthjustice.org

JENNY K. HARBINE (MSB #8481)
Earthjustice
313 East Main Street
Bozeman, MT  59715-6242
(406) 586-9699 | Phone
(406) 586-9695 | Fax
jharbine@earthjustice.org
*Pro Hac Vice application forthcoming
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | | |
|---|---|---|
| UPPER MISSOURI WATERKEEPER, | ) | No.  CV-22-32-GF-BMM |
| | ) | |
| Plaintiff, | ) | COMPLAINT FOR |
| | ) | DECLARATORY AND |
| v. | ) | INJUNCTIVE RELIEF |
| | ) | |
| UNITED STATES ENVIRONMENTAL | ) | |
| PROTECTION AGENCY and MICHAEL S. | ) | |
| REGAN, Administrator, United States | ) | |
| Environmental Protection Agency, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

INTRODUCTION

1.      Plaintiff Upper Missouri Waterkeeper ("Waterkeeper") brings this action to address the failure of the U.S. Environmental Protection Agency ("EPA") to comply with its mandatory duty under the Clean Water Act to approve or disapprove revised water quality standards for Montana waters.

2.      Waterkeeper also brings this action under the Administrative Procedure Act for: (1) EPA's unlawful withholding of action under the Clean Water Act's deadlines for approving or disapproving Montana's revised water quality standards; and (2) EPA's unreasonable delay in acting on Waterkeeper's petition to EPA to review and either approve or disapprove Montana's revised water quality standards.

3.      As set forth in detail below, Waterkeeper asks that the Court direct EPA to comply with its mandatory duty, or in the alternative, act on Waterkeeper's petition.

PARTIES AND STANDING

4.      Plaintiff Upper Missouri Waterkeeper, Inc. ("Waterkeeper") is a non-profit membership organization dedicated exclusively to protecting and improving the ecological and aesthetic qualities of Southwest and West-central Montana's Upper Missouri River Basin.  Waterkeeper is located at 24 S. Wilson Ave., Suite 6-7, Bozeman, Montana 59715.  As part of its mission, Waterkeeper engages in

policy, science and rulemaking related to Montana's implementation of its Clean

Water Act duties and citizens' guarantee to a clean and healthful environment

under our constitution.

5.      Defendant United States Environmental Protection Agency ("EPA")

is an agency of the United States charged with overseeing and approving or

disapproving state water quality standards pursuant to 33 U.S.C. § 1313 to protect

the public health or welfare, enhance the quality of water and serve the purposes of

the Clean Water Act.

6.      Defendant Michael S. Regan, the chief officer and Administrator of

EPA, is the federal official ultimately responsible for EPA's administration and

implementation of its legal duties.  Administrator Regan is sued in his official

capacity.

7.      Waterkeeper's donors, supporters, and members reside on or near, or

recreate on the waters of Montana, including waters affected by nutrient water

quality standards.  EPA's failure to act on and disapprove Montana's repeal of

previously EPA-approved numeric water quality standards injures Waterkeeper

and its members by allowing Montana to promulgate and implement water quality

standards and issue National Pollutant Discharge Elimination System ("NPDES")

permits that are not protective of designated uses—uses to which Waterkeeper's

members put Montana's waters.

8.     Nutrient pollution causes and contributes to algal, bacterial and plant growth in waters which, in turn, depletes oxygen to the detriment of fish and wildlife.  This can create toxic or harmful conditions for wildlife and humans and can cause severe habitat and aesthetic degradation in affected waters.  Waterkeeper members who recreate and/or fish on Montana's waters are adversely affected by nutrient pollution and the algal, bacterial and plant impacts it causes when it adversely affects or kills fish and invertebrate populations through oxygen depletion or habitat alteration; when toxic algal blooms can affect humans, pets, and wildlife that come into contact with that water; and when nutrient-fed algal and plant blooms create unsightly and disruptive or unbalanced conditions in waters of the state.

9.     Waterkeeper has representational standing to bring this action.  EPA's failure to disapprove Montana's repeal of EPA-approved numeric water quality standards has an adverse impact on Waterkeeper and Waterkeeper's supporters' ability to use and enjoy water bodies in Montana, and has injured the recreational, environmental, aesthetic, and/or other interests of Waterkeeper and its members. These injuries are traceable to EPA's failure to act as required by the Clean Water Act and are capable of redress by action of this Court.

10.     Waterkeeper has organizational standing to bring this action. Waterkeeper has been actively engaged in a variety of educational and advocacy

efforts to improve water quality standards and regulation in the state of Montana. EPA's failure to disapprove Montana's repeal of previously-approved numeric water quality standards adversely affects Waterkeeper's clean water advocacy efforts, including by requiring Waterkeeper to continue expending resources to address avoidable nutrient pollution in lieu of using those resources to advance other water quality priorities in Montana.  These injuries are fairly traceable to EPA's violations and are redressable by the Court.

## JURISDICTION AND VENUE

11.     Waterkeeper brings this action for review pursuant to the Clean Water Act, 33 U.S.C. § 1365(a), for EPA's failure to perform its mandatory duty under 33 U.S.C. § 1313(c), and the Administrative Procedure Act, for EPA's unlawfully withholding action to approve or disapprove Montana's revised water quality standards under the Clean Water Act's deadlines and EPA's unreasonable delay in acting on Waterkeeper's petition.  5 U.S.C. §§ 706(1), 555(b).  Waterkeeper seeks declaratory judgment pursuant to 28 U.S.C. § 2201, injunctive relief pursuant to 28 U.S.C. § 2202 and 33 U.S.C. § 1365(a), and its litigation costs under 33 U.S.C. § 1365(d).

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. §§ 701-706 (judicial review under the Administrative Procedure Act).

13.     Venue is proper in this Court and this Division under 28 U.S.C. § 1391(e) because Waterkeeper and its members reside in the District of Montana, Waterkeeper maintains its office in Bozeman, and Waterkeeper's mission and purpose is the protection of the Upper Missouri River.  Further, the nutrient standards at issue affected a large portion of the Missouri River watershed. Because the bulk of the Missouri River watershed is in the portion of the state and counties where venue is proper in Great Falls, Montana, this case is filed in the Great Falls Division of U.S. District Court, District of Montana.

14.     More than 60 days prior to the filing of this action, Waterkeeper gave notice of the violation to the EPA Administrator as required under the Clean Water Act, 33 U.S.C. § 1365(a)(2), and EPA's implementing regulations, 40 C.F.R. § 135.1(a) and 135.3(b).  A true and correct copy of the Notice is attached as Exhibit A and incorporated by reference.

LEGAL BACKGROUND

I.     CLEAN WATER ACT

    A.     <u>Water Quality Standards</u>

15.     The Clean Water Act requires states to set water quality standards necessary to achieve the requirements of the Clean Water Act:  to restore and maintain the chemical, physical, and biological integrity of the Nation's waters, including the protection and propagation of fish and shellfish, and to prohibit pollution to water in toxic amounts.  33 U.S.C. §§ 1251(a) and 1313(c)(2)(A).

16.     Water quality standards must protect the public health or welfare, enhance the quality of water and, wherever attainable, provide water quality for the protection and propagation of fish, shellfish and wildlife and for recreation in and on the water, taking into account their use and value of public water supplies, and agricultural, industrial, and other purposes including navigation.  33 U.S.C. § 1313(c)(2)(A).

17.     A state's water quality standards must include use designations for specific water bodies and water quality criteria necessary to protect those designated uses.  33 U.S.C. § 1313 and 40 C.F.R. §§ 131.6 and 131.10.  Water quality criteria must ensure that designated uses of specified waters such as protection of fish and wildlife, consumption of fish, and recreational uses such as fishing, swimming and boating are achieved and maintained.  *Id.* and 40 C.F.R. §§ 131.2 and 131.3(i).  Criteria must be adequate to protect designated uses, be based on sound scientific rationale, and protect the most sensitive use.  40 C.F.R. § 131.11(a).

18.     States are directed to establish numerical values for water quality criteria and should only use narrative criteria where numerical criteria cannot be established or to supplement numerical criteria.  40 C.FR. § 131.11(b).

19.     The Clean Water Act requires the state to adopt, and EPA to consider in its approval of a state's water quality standards, an antidegradation policy.  40

C.F.R. §§ 131.12, 131.5(a)(3).  An antidegradation policy prevents lowering the quality of waters that exceed standards, except in limited circumstances.  *Id*. § 131.5(a)(3).  EPA's guidance recognizes "de minimis" exemptions from antidegradation review to allow states to focus on controlling more significant degradation, but recommends a cumulative cap applied to the water body to avoid the cumulative harmful effect of many nonsignificant discharges.  States may exercise their implied *de minimis* authority and exempt a discharge from antidegradation review only if the discharge's impact on water quality is insignificant, constrained by the purposes of the CWA, and genuinely *de minimis* as proven by findings.  A state agency must look at the particular circumstances of a discharge when applying a *de minimis* exemption to ensure that the discharge is insignificant-in-fact: "[u]nless a state … can provide appropriate technical justification, it should not create categorical exemptions from [antidegradation] review for specific types of activities based on a general finding that such activities do not result in significant degradation."  Montana has a longstanding antidegradation policy.  75-5-303, MCA ("nondegradation policy").

B.    EPA's Obligations Under the Clean Water Act

20.    Whenever a state adopts a new or revised water quality standard, it must submit it to EPA for review and disapproval or approval "within 30 days of

the final state action to adopt and certify the revised standard." 33 U.S.C. § 1313(c)(2)(A).

21.    EPA must review the new or revised water quality standard within 60 days of submission of the new or revised standard to EPA. *Id*. § 1313(c)(3).

22.    EPA must approve or disapprove a state's water quality standards by determining, among other things, whether the state has adopted designated water uses consistent with the CWA, whether the state has adopted criteria that protect the designated water uses based on sound scientific rationale, whether the state has adopted an antidegradation policy consistent with EPA's regulations, whether the state standards are based on appropriate technical and scientific data and analyses, and whether the state has followed the applicable legal procedures for revising or adopting standards. 33 U.S.C. § 1313(c)(2)(a); 40 C.F.R. § 131.21(b), 131.5, and 131.6.

23.    If EPA determines the new or revised standard meets the requirements of the Clean Water Act, then EPA approves the new or revised standard and the new or revised standard becomes the water quality standard for the applicable waters of that state. 33 U.S.C. § 1313(c)(3).

24.    If EPA determines that the new or revised standard does not meet the requirements of the Clean Water Act, then the Administrator shall disapprove the new or revised standard and, within 90 days of the state's submission, notify the

state of specific changes to make to correct the standard.  *Id*.  If such changes are not made within 90 days of notice, then EPA must "promptly" prepare and publish proposed federal regulations with a new or revised water quality standard and promulgate final regulations not later than 90 days after EPA publication of the proposed standard.  33 U.S.C. § 1313(c)(3), (c)(4).

25.     Congress also assigned EPA the authority and obligation to independently and at any time review, assess and determine whether a state's water quality is meeting the requirements of the Clean Water Act necessitating a new standard or a revision.  *Id*. § 1313(c)(4)(B).

II.     ADMINISTRATIVE PROCEDURE ACT

26.     In enacting the Administrative Procedure Act ("APA"), Congress provided for sweeping judicial oversight of federal agency action.  5 U.S.C. § 551, *et seq*.

27.     A reviewing court may compel action if the agency has a duty to act and it has unlawfully withheld action under statutory deadlines or "unreasonably delayed" action in discharging that duty.  *Id.* § 706(1).  Pursuant to § 555(b) of the APA, each federal agency has a duty to "conclude a matter presented to it" in "a reasonable time."  *Id.* § 555(b).

FACTUAL BACKGROUND

I.    EPA APPROVED 2015 WATER QUALITY STANDARDS THAT
      ADDRESS MONTANA'S PERSISTENT NUTRIENT POLLUTION.

28.    Nutrient pollutants are phosphorus and nitrogen.  Nutrient pollutants
act as fertilizer in water, causing and contributing to the growth of harmful algal
blooms, bacteria, and excessive plant growth.  These algal blooms, bacteria, and
plant growth, in turn, cause and increase turbidity in water, cause and contribute to
reductions in dissolved oxygen, and for certain types of algae, can produce toxins.
These problems all adversely affect fish, aquatic invertebrates, wildlife and human
health and recreation.  EPA, Nutrient Criteria Technical Guidance Manual:  Rivers
and Streams at 3-5 (July 2000).  Nutrient pollution impairs designated uses by
impairing fishing, impairing wildlife and impairing human health and contact with
waters affected.

29.    Nutrient pollutants can cause damage downstream from the source,
sometimes for great distances and extended periods of time.  For example, hypoxia
in the Gulf of Mexico is an oxygen depletion problem caused by nutrient pollutants
in the extended Mississippi River watershed.  Nutrient pollutants can accumulate
in aquatic systems by attaching to sediments, causing algal blooms to increase and
recur when sediments are remobilized.  This in turn causes new or repeated water
quality problems even after the original source of pollution is reduced or removed.
Nutrients are sometimes referred to as "conservative" or "cumulative" pollutants

because of their ability to damage waters away from a source and for an extended period of time.

30.     In 2000, EPA, in recognition of the problems caused by nutrient pollution, issued direction and guidance to the states to develop numeric nutrient criteria to protect designated uses in all waters.  EPA, Nutrient Criteria Development; Notice of Nutrient Criteria Technical Guidance Manual: Rivers and Streams, 65 Fed. Reg. 46167-46169 (July 27, 2000).  EPA directed the states to develop standards by 2003, and provided states with guidance on standards development and a set of standards, developed by ecoregion, that states could adopt if they chose not to develop their own or until they developed their own.  *Id.*

31.     The state of Montana has long acknowledged that nitrogen and phosphorus are two of the most problematic types of pollution in Montana's waters.  In fact, excess nitrogen and phosphorus account for nearly twenty percent of all stream miles impaired by all forms of water pollution in Montana. Unhealthy nitrogen and phosphorus levels, in combination with the challenges presented by chronic dewatering and evolving precipitation and land use patterns, are cumulatively degrading dozens of waterways across Montana, rendering them unfishable, unswimmable, and/or unsuitable for recreation.

32.     In 2014, Montana promulgated numeric water quality criteria for phosphorus and nitrogen (nutrient pollutants), based on years of scientific analysis

and development, including EPA's Ecoregional Nutrient Criteria.

33.     Montana found—and EPA ultimately agreed in 2015—that the

numeric nutrient water quality criteria adopted by the state are necessary to protect

the designated uses of a majority of Montana's wadeable streams and certain

additional specified waters.  Montana Dep't of Environmental Quality Department

Circular DEQ-12A ("Circular 12-A").  Montana's nutrient water quality criteria for

wadeable streams provide that phosphorus shall not exceed 25 micrograms (µ) per

liter (L) to as high as 150 µ/L depending on the ecoregion (with 25 µ/L being the

most common and widespread).  For nitrogen, the standard varies from 275 µ/L to

1300 µ/L, again depending on the ecoregion.  Table 12A-1, Circular 12-A.

34.     Montana's 2015 nutrient water quality criteria, set forth above, are

based upon EPA's original ecoregional criteria guidance documents, years of

sampling and research by Montana Department of Environmental Quality, and

many scientific studies showing the necessary numeric criteria for nutrients in

streams adequate to protect aquatic life and designated uses from the adverse

effects of nutrient pollution.

35.     In 2015, Montana submitted its numeric nutrient criteria to EPA for

review and approval, as required by the Clean Water Act.  Based upon the

scientific and technical record and based upon EPA's own guidance and research

on nutrient pollution, EPA approved Montana's numeric nutrient criteria on

February 26, 2015.  Those criteria were found necessary to protect the designated

uses of Montana waters, for example, for health, fishing, and recreation, from the

damaging effects of excess nutrients.  The 2015 standards are fully supported by

sound science and protected the most sensitive use.  40 C.F.R. § 131.11(a).  As

such, the 2015 numeric nutrient criteria complied with the Clean Water Act and

EPA's implementing regulations.  33 U.S.C. § 1313; 40 C.F.R. §§ 131.6, 131.10,

131.2, 131.3(i).

II.    EPA HAS BEEN ENGAGED IN LONGSTANDING LITIGATION
       CHALLENGING MONTANA'S EFFORTS TO UNDERMINE THE
       NUMERIC-BASED WATER QUALITY STANDARDS.

       36.    With the numeric-based water quality standards for nutrients (Circular

12-A), Montana also submitted (1) a variance from the numeric-based standards

and (2) implementing rules that void the numeric-based standards and revert to

narrative standards if certain events occur.  Montana Dep't of Environmental

Quality Department Circular DEQ-12-B ("Circular 12-B"); ARM §§ 17.30.619(2)

and 17.30.715(4) (hereinafter the "Poison Pill").  The proposed variance in

Circular 12-B would give Montana twenty years to reach compliance with the

water quality standards and would fail to meet the highest attainable condition in

Montana waters as early as possible.  The Poison Pill would void the numeric-

based standards for designated uses and revert to generally applicable narrative

standards if a court invalidates or EPA disapproves any part of the state statute

codifying the numeric-based standards or Montana DEQ's implementing rules. Both the variance and the Poison Pill are subjects of ongoing litigation before the District of Montana.

37.    EPA initially approved the variance on February 26, 2015, the same day it approved the numeric-based standards, and then approved a revised version of the variance on October 31, 2017.  Waterkeeper successfully challenged the variance in the District of Montana.  The Court vacated the variance, but stayed vacatur and remanded to Montana to revise the variance.  Case No. CV-16-52-GF-BMM, Dkt. Nos. 177, 184, and 211.  Montana revised the variance and resubmitted to EPA on November 29, 2019.  On February 24, 2020, EPA disapproved the November 2019 revised variance as inconsistent with the Court's order.

38.    On February 24, 2020, EPA also approved the Poison Pill, originally submitted to EPA in 2015, on which it had not yet acted.  Under the Poison Pill's terms, EPA's disapproval of the variance voided Montana's numeric-based standards with criteria for designated uses, and reverted to generally applicable narrative standards for all waters and pollutants.

III.   EPA HAS RECEIVED NOTICE OF MONTANA'S REPEAL OF
       NUMERIC-BASED WATER QUALITY STANDARDS AND
       WATERKEEPER'S PETITION.

39.    Montana repealed by legislation the 2015 numeric-based water quality

standards, including all variances and schedules.  On April 30, 2021, Montana

Governor Gianforte signed Montana Senate Bill 338 ("SB 358"), which repealed

Montana's 2015 EPA-approved numeric water quality standards for nutrient

pollution, originally codified at 75-5-313, MCA.  SB 358 became effective, under

its own terms, as a self-executing statutory mandate when the Governor signed the

bill, and has been codified at 75-5-321, MCA.

40.    SB 358's repeal of the numeric criteria and reversion back to a general

narrative standard replaced protective, science-based numeric water quality criteria

for nutrients, found to be necessary to protect designated uses, with less-protective,

narrative water quality standards for nutrients that the state and EPA had already

determined inadequate to protect designated uses.

41.    Montana's revised water quality standards (SB 358, Section 7) also

categorically exempt nutrient discharges more broadly than is allowed under

federal requirements, evading the required *de minimis* showing for individual

activities and the particular circumstances of a discharge, which are necessary to

avoid antidegradation review.  These revisions and exemptions to Montana's

-16-

nondegradation policy are codified at MCA 75-5-317(2)(u). Montana's

nonsignificance exemptions contradict EPA's guidance and regulations.

42.    SB 358 revised sections 75-5-103, 75-5-105, 75-5-317, and 75-5-320,

MCA.  It repealed sections 75-5-313, 75-5-314, and 75-5-319, MCA and ARM

17.30.660.

43.    EPA received notice from Waterkeeper about the draft legislation on

April 23, 2021, and again after the legislation became effective on May 24, 2021.

44.    Waterkeeper's letter and Petition for EPA Rulemaking describe how

Montana's revised water quality standards violate the Clean Water Act and the

harm to Waterkeeper's interests.  Waterkeeper's petition asked EPA, pursuant to 5

U.S.C. §§ 553(e) and 555(e), to disapprove Montana's revised water standards and

promulgate its own rulemaking that meets the requirements of the Clean Water

Act.

45.    Montana has not submitted its revised water quality standards to EPA

for review.  Under EPA's regulations implementing the Clean Water Act's

requirement that states submit their revised water quality standards to EPA, a state

has "30 days from the final state action to adopt and certify the revised standard" to

submit its revised standards to the EPA Regional Administrator.  33 U.S.C. §

1313(c); 40 C.F.R. § 131.20(c).  The Governor's approval of SB 358 on April 30,

2021, rendering it effective on that day, was a "final state action to adopt and certify the revised standard."  Thirty days from that action was May 30, 2021.

46.    SB 358's direction to adopt a rulemaking implementing the revised water quality standards and Montana DEQ's attempt to apply the revised standards to permit applications support that the revised water quality standards are a final state action to adopt and certify the revised standard.

47.    SB 358 directed adoption and amendment of administrative rules implementing narrative standards promulgated by Montana Department of Environmental Quality (MDEQ) by March 1, 2022.  MDEQ issued draft implementing regulations for SB 358 on December 23, 2021, known as "New Rule 1," which affirmed a deadline of March 1, 2022.  EPA received notice of this rulemaking deadline on April 23, 2021, when Waterkeeper notified EPA about SB 358, and again after SB 358 became effective and Waterkeeper submitted its petition to EPA on May 24, 2021.  New Rule 1 has since been formally adopted into rule exactly as proposed by Montana.

48.    On July 12, 2021, MDEQ released public notice of its intention to approve a draft permit for the City of Helena's wastewater treatment plant, MT0022641, which applied the revised, weaker narrative water quality standards. MDEQ, Public Notice No. MT-21-16, available at: https://deq.mt.gov/News/public notices-folder/news-article29.  EPA received notice of this permit at the latest on

August 11, 2021, when Waterkeeper submitted its public comments to MDEQ and sent a copy to EPA.  MDEQ has paused renewing the City of Helena's permit application for its wastewater treatment plant and has not issued a permit that applies numeric nutrient criteria, allowing Helena to continue to discharge nutrients without a water quality-based effluent limit based upon applicable water quality criteria.

49.     Under the Clean Water Act, EPA has 60 days from submission to approve, or 90 days to disapprove, a state's revised water quality standards. Ninety days from the state's May 30, 2021 deadline to submit to EPA was August 28, 2021.  33 U.S.C. § 1313(c); 40 C.F.R. § 131.21(a)(2).

50.     Since the passage of SB 358, MDEQ has begun to apply only the narrative nutrient standards to permitting facilities under the Clean Water Act, not approved numeric nutrient criteria.

51.     Since the passage of SB 358, MDEQ has not renewed several Clean Water Act permits for other nutrient dischargers, allowing discharges of nutrients to continue under old, expired permits that do not have numeric nutrient effluent limits.

52.     Allowing less protective narrative nutrient standards to apply adversely impacts ecological, human health, and recreational designated uses. Increases in nutrients to water increase algal bloom.  Widespread and prolonged

algal blooms can negatively affect water chemistry and aquatic life. Exposure to algal bloom through drinking or swimming can cause serious health problems, including rashes, stomach or liver illness, respiratory problems, and neurological effects. EPA, *Nutrient Pollution, The Effects: Human Health*, available at: https://www.epa.gov/nutrientpollution/effects-human-health (last accessed March 4, 2022). Nuisance algal blooms caused or contributed to by nutrient discharges harm recreational designated uses of many Montana waters. EPA's delay and failure to disapprove or approve Montana's revised water quality standards allows MDEQ to continue to apply the less protective narrative standards, which adversely impacts human health and protected designated uses of Montana's waters.

53.    On August 18, 2021, EPA provided comments by letter to MDEQ acknowledging Montana's repeal of numeric water quality criteria and identifying deficiencies in Montana's use of narrative water quality standards. EPA offered recommendations for how narrative criteria might be applied to identify protective levels of nutrient pollutants in water bodies when assessing waters, developing TMDLs (Total maximum daily loads), evaluating discharges, and developing effluent limitations. EPA also asked questions related to ecological response indicators and suggestions for additional rationale, analyses, and data collection.

54.    As of the date of filing this complaint, EPA has not approved or disapproved Montana's revised water quality standards.

### FIRST CAUSE OF ACTION—EPA FAILED TO PERFORM ITS MANDATORY DUTY UNDER THE CLEAN WATER ACT; 33 U.S.C. § 1313

55.    Waterkeeper realleges all preceding paragraphs.

56.    EPA has a mandatory duty under the Clean Water Act to approve or disapprove Montana's revised water quality standards and to do so within a designated period of time.  33 U.S.C. § 1313(c)(3).

57.    EPA received notice and submission of Montana's revised water quality standards in SB 358 no later than April 23, 2021.  EPA received notice and submission of the Montana Governor's April 30, 2021 approval of Montana's revised water quality standards in SB 358 on or before May 24, 2021.  EPA has acknowledged it is aware of and commented on Montana's revised water quality standards on or before August 18, 2021.

58.    Montana's revisions to its nondegradation policy pursuant to SB 358 are codified at MCA 75-5-317(2)(u) and are currently being applied under state law, despite EPA not having reviewed or approved those revisions.

59.    EPA has not performed its mandatory duty to approve or disapprove Montana's revised water quality standards within 60 days of submission.  EPA's

failure to perform its mandatory duty is a violation of the Clean Water Act, 33 U.S.C. § 1313.

60.     Based upon the foregoing and 33 U.S.C. § 1313, Waterkeeper is entitled to an order requiring EPA to immediately approve or disapprove Montana's revised water quality standards.

## SECOND CAUSE OF ACTION—EPA HAS UNLAWFULLY WITHHELD ACTION UNDER THE CLEAN WATER ACT

61.     Waterkeeper realleges as if fully set forth herein, every allegation contained in the preceding paragraphs.

62.     EPA has a mandatory duty under the Clean Water Act to approve or disapprove Montana's revised water quality standards and to do so within a designated period of time.  33 U.S.C. § 1313(c)(3) and (c)(4).

63.     EPA's regulations implementing the Clean Water Act require states to submit revised standards to EPA for review "within 30 days of the final state action to adopt and certify the revised standard."  33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.20(c).

64.     Montana Governor Gianforte's approval of SB 358 is a final state action to adopt and certify the revised standard.

65.     Montana has not submitted its revised water quality standards to EPA for approval.

66.     EPA received notice and submission of Montana's revised water quality standards in SB 358 no later than April 23, 2021, when Waterkeeper sent its letter to EPA.  EPA received notice and submission of the Montana Governor's April 30, 2021 approval of Montana's revised water quality standards in SB 358 on or before May 24, 2021, when Waterkeeper filed its petition with EPA.  EPA has acknowledged it is aware of and commented on Montana's revised water quality standards on or before August 18, 2021.

67.     EPA has 60 days from the state's submission to approve or 90 days to disapprove the revised standards.  33 U.S.C. § 1313(c)(3) and (c)(4); 40 C.F.R. § 131.21(a).  Where a state has not made the recommended changes within 90 days of notice, then EPA must "promptly" prepare and publish proposed federal regulations with a new or revised water quality standard and promulgate final regulations not later than 90 days after EPA publication of the proposed standard. 33 U.S.C. § 1313(c)(3) and (c)(4).

68.     In any case where EPA determines that a revised water quality standard is necessary, EPA must "promptly" prepare and publish proposed federal regulations.  33 U.S.C. § 1313(c)(4)(B).

69.     EPA's failure to approve or disapprove Montana's revised water quality standards is an action unlawfully withheld under the APA and the Clean Water Act's statutory deadlines.  33 U.S.C. § 1313; 5 U.S.C. §§ 706(1), 555(b).

70.     Based upon the foregoing, Waterkeeper is entitled to an order requiring EPA to immediately approve or disapprove Montana's revised water quality standards.

## THIRD CAUSE OF ACTION—EPA HAS UNREASONABLY DELAYED OR FAILED TO ACT ON WATERKEEPER'S PETITION

71.     Waterkeeper realleges as if fully set forth herein, every allegation contained in the preceding paragraphs.

72.     As of the date of filing, EPA has had Waterkeeper's petition for over nine months.  EPA considered and commented on Montana's revised water quality standards over six months ago, but has taken no action on Waterkeeper's petition.

73.     The Clean Water Act gives EPA 60 days to review new or revised standards and up to 90 days to provide disapproval with information on how to correct deficient standards.  Where a state has not made the recommended changes within 90 days of notice, then EPA must "promptly" prepare and publish proposed federal regulations with a new or revised water quality standard and promulgate final regulations not later than 90 days after EPA publication of the proposed standard.  33 U.S.C. § 1313(c)(3), (c)(4).

74.     Defendant's unreasonable delay and failure to act violates the APA, which directs agencies to "within a reasonable time … conclude a matter presented to it," 5 U.S.C. § 555(b), and which mandates that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request

of an interested person made in connection with any agency proceeding." *Id.* §

555(e).

75.     The APA further mandates that the Court shall "compel agency action

[] unreasonably delayed." *Id.* § 706(1).

76.     Based upon the foregoing, Waterkeeper is entitled to an order

requiring EPA to disapprove Montana's revised water quality standards and

promulgate its own rulemaking that meets the requirements of the Clean Water

Act.

## REQUEST FOR RELIEF

Based on the foregoing, Upper Missouri Waterkeeper requests the following

relief:

1.     A declaration that EPA is in violation of the Clean Water Act for its

failure to approve or disapprove Montana's revised water quality standards;

2.     A declaration that EPA's failure to approve or disapprove Montana's

revised water quality standards is an unlawfully withheld action under the Clean

Water Act's statutory deadlines;

3.     A declaration that EPA has unreasonably delayed acting on Plaintiff's

petition seeking EPA's disapproval of Montana's revised water quality standards;

4.     An injunction requiring EPA to comply with the Clean Water Act by

approving or disapproving Montana's revised water quality standards within 60

days of this Court's order;

5.     An award of Waterkeeper's costs and attorneys' fees as determined appropriate; and

6.     Such other and further relief as the Court deems just and equitable.

Dated:  March 24, 2022.

Respectfully submitted,

*/s/ Jenny K. Harbine*

JENNY K. HARBINE (MSB #8481)
Earthjustice
313 East Main Street
Bozeman, MT  59715-6242
(406) 586-9699 | Phone
(406) 586-9695 | Fax
jharbine@earthjustice.org
*Local Counsel for Plaintiff*


*/s/ Janette K. Brimmer*

JANETTE K. BRIMMER (WSB #41271)*
PAULO PALUGOD (WSB #55822)*
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA  98104-1711
(206) 343-7340 | Phone
jbrimmer@earthjustice.org
ppalugod@earthjustice.org
*Pro Hac Vice application forthcoming

*Attorneys for Plaintiff*